# United States District Court
## Middle District of Florida
### Orlando Division

**JACK W. BERRY,**

**Plaintiff,**

-vs-                                                      Case No.  **6:09-cv-1186-Orl-GJK**

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

# MEMORANDUM OF DECISION

Jack W. Berry (the "Claimant"), appeals to the District Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for benefits. Doc. No. 1.  Claimant argues that the final decision of the Commissioner should be reversed because: 1) the Administrative Law Judge (the "ALJ") failed to consider the combined effect of all impairments at step-two of the sequential evaluation process; 2) the ALJ failed to apply the proper legal standard and lacked good cause to disregard the opinion of Claimant's treating neurologist, Dr. Sealy; 3) the ALJ's finding that Claimant does not satisfy the criteria for Listing 1.04 is not supported by substantial evidence; 4) the ALJ erred by failing to incorporate the results of the Psychiatric Review Technique (the "PRT") into his analysis; 5) the ALJ erred by failing to order a consultative psychiatric examination; 6) the ALJ erred by failing to properly apply the pain standard and SSR 96-7p in weighing the Claimant's credibility; 7) the ALJ erred by failing to re-contact Claimant's physicians regarding inconsistencies in the record; and 8) the ALJ erred by failing to consider the side-effects of Claimant's medications and its effect on

Claimant's residual functional capacity (the "RFC"); and 9) the ALJ erred by acting as both judge and physician. The Commissioner's decision is **REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) because the ALJ erred by failing to consider all of Claimant's impairments in combination and because the ALJ lacked good cause and failed to comply with SSR 96-5p when disregarding the opinions of Claimant's treating neurologist.**

## I.   BACKGROUND.

Claimant was born on June 1, 1961, and he a general education diploma ("GED"). R. 32, 179, 220. Claimant's past employment experience includes working as a heavy duty truck mechanic. R. 35-37, 216. On December 19, 2005, while working on the engine of a semi-truck, Claimant slipped and fell through the engine compartment injuring his back. R. 40. Claimant has not engaged in substantial gainful activity since January 6, 2006. R. 13, 37.  On February 28, 2007, Claimant filed an application for benefits alleging an onset of disability as of December 19, 2005. R. 179. At the hearing before the ALJ, Claimant amended his onset of disability date to January 6, 2006. R. 30-31. Claimant alleges disability due to complications from his back injury, constant pain, and depression. R. 48, 215, 220, 260.[1]  In his disability questionnaires, Claimant repeatedly stated that his medications cause fatigue and irritability. R. 222, 249. At the hearing before the ALJ, Claimant reported that his medications cause drowsiness. R. 51.

---

[1] On May 11, 2007, the Commissioner inquired whether Claimant was also suffering from a mental impairment because he reported taking Cymbalta for his nerves. R. 234. Claimant stated then that he was not being treated for any mental impairment and the Cymbalta was prescribed to "help rebuild the actual nerves." R. 234. However, in a subsequent Disability Report – Appeal, Claimant asserted that he was now being treated for depression by his neurologist as a result of the ongoing back injury and pain. R. 260. Claimant reported taking Celexa, Neurontin, and Wellbutrin for his depression and nerves. R. 261. At the hearing before the ALJ, Claimant also alleged that he suffers from depression. R. 48.

## II.    RELEVANT MEDICAL RECORD.

Prior to his back injury, Claimant's medical record reveals treatment for joint pain, left shoulder pain, periarthritis, left knee and low back pain.  R. 304-05, 446-59.  After falling on December 19, 2005, Claimant did not seek immediate medical treatment, but when the pain in his back and left leg did not subside, on January 6, 2006, Claimant went to the emergency room. R. 41, 352.[2]  On January 16, 2006, Claimant presented to Dr. Hani El Kommos complaining of continued pain in his back and left leg.  R. 352.  Physical examination revealed bilateral positive straight leg tests and loss of sensation in the left lateral calf.  R. 352.   Dr. Kommos ordered an MRI of the lumbar spine and opined that Claimant would probably need a series of epidural steroid injections and possibly surgery.   R. 352.    The MRI revealed left paracentral disc protrusion at L4-L5 resulting in left lateral recess stenosis and mass effect on the descending left L5 nerve root.  R. 360.  A concentric bulge with a posterior disc protrusion was also present at the L5-S1, minimally touching the thecal sac. R. 360.  The radiologist opined that the mild bilateral foraminal stenosis at L4-L5 and L5-S1 was due to concentric bulges and facet disease. R. 360.

On January 19, 2006, Claimant continued to complain of back pain and left sciatica pain. R. 351.  Claimant continued to have positive straight leg tests at about 80 degrees with a stretch, but no weakness. R. 351.    Diminished sensation was observed in the left thigh.  R. 351.  Dr. Kommos stated that Claimant should remain off work, scheduled a series of epidural steroid injections, and prescribed Medrol-Dosepak and Tagamet.  R. 351.    On February 23, 2006, Claimant reported that the epidural injections had helped some and he had no sciatica pain.  R. 351.  Dr. Kommos continued to keep Claimant off of work because "he is still not ready to

---

[2] The January 6, 2006, emergency room records are not part of the record.

return," and scheduled physical therapy sessions.  R. 351.

On April 5, 2006, Claimant presented to Dr. Kommos complaining of increased pain in his back radiating down his left leg.  R. 350.  Straight leg testing was positive.  R. 350.  Dr. Kommos recommended surgical intervention.  R. 350.  On April 12, 2006, Dr. Kommos ordered another MRI.  On April 26, 2006, Dr. Kommos explained that the MRI showed "a large disc herniation at L4-L5 extending to the left."  R. 350.  Dr. Kommos's notes show that Claimant was still having sciatic pain, "is not capable of working," and the series of epidural injections failed.  R. 349.  On May 9, 2006, another MRI showed disc herniation at L4-L5 "resulting in effacement of the lateral recess and moderate central canal narrowing."  R. 358.

On May 15, 2006, Dr. Kommos's notes state:

> This gentlemen, over the last week started to have numbness in reference to his opposite leg, the right leg.  He did have a full-blown foot drop.  He was admitted to the hospital.  We repeated the MRI.  The MRI did reveal that he did have only a disc herniation at the L4-L5 on the left side.  He is coming in for preop, but he came to our offices in [a] wheelchair.  I had Dr. Sealy evaluate the patient in the hospital and he felt that the foot drop is related to common perineal nerve palsy.  However, when I examined him today he is complaining of bilateral leg pain.  He is having difficulty walking.  He is beginning to have some weakness in reference to his left lower extremity.  As far as I am concerned, all these symptoms cannot be explained on the basis of the L4-L5 disc herniation.  This is why I am reluctant to officer [sic] him any surgical intervention tomorrow, unless we know the diagnosis. . . .

R. 348-49.  Dr. Kommos cancelled the surgery and referred Claimant to Dr. Sealy for a full neurological examination and EMG study.  R. 348.

On May 17, 2006, Claimant presented to Dr. Dalwyn M. Sealy, a neurologist, with post traumatic neurological syndrome, paraparesis, herniated disc disease, lumbrosacral radiculopathy, and radicular lower back pains.  R. 417.  Dr. Sealy's notes state:

This is the first post hospital follow up visit for [Claimant] in reference to lower back injuries sustained after falling off one of the large diesel engines during the line of his occupation as a mechanic. It should be noted that he apparently worked for three weeks after the incident until he was rendered immobile by pain when [he] was . . . seen by an orthopedic surgeon. [Magnetic resonance imaging] of the lumbar region apparently revealed the herniated disc as above and he was apparently being staged for surgery. During this time the lower back pain became severe and he presented to Wuesthoff Rockledge where he was seen on consultation as a result of the right foot drop thought not to be in keeping with his radiologic disease. He was found to have right foot drop with impaired eversion and preserved inversion and also inversion on dorsiflexion. He was unable to demonstrate sensory changes on the lateral aspect of the right foot and leg as the left side findings made this more difficult. He was discharged with future plans for NCV/EMG. Today, a precocious visit was offered as his concerns generate some anxiety.

Today he says that he experienced numbness of both lower limbs above the groin level and in fact he says this was in line to the hips. That is, he describes a sensory level type symptom of possibly T11 down. This apparently occurred two days ago and now he has the sensation back. The pain continues, [low back pain] radiating to the gluteal region bilaterally, extending down the lateral aspect of the thighs to the knees and with discomfort in the right calf. He complains of sacral paraesthesia but denies sphincter dysfunction although he mentioned difficulty with "gas control" a new feature. His significant distress is these pains and spasms of the hamstrings. In fact he now partly uses a walker and this same as a wheel chair.

R. 417 (brackets added). Dr. Sealy's notes show that Claimant was distressed during the

physical examination, but his tone and strength were normal. R. 417. Hip flexion was limited

by pain. Lower extremity strength and flexion were limited by pain with left side pain greater

than right. R. 417. Sensation and coordination were normal, but gait was painful as he used a

walker and bilateral foot drop greater on the right. R. 418. Dr. Sealy's impression was

paraparesis, cauda equine syndrome, and bilateral lumbar sacral radiculopathy. R. 418. Dr.

Sealy recommended further magnetic resonance images ("MRIs") and an electromyography

("EMG"), prescribed Crisoprodol and Mobic for pain, and stated that physical therapy and occupational therapy "will not be tolerated at this time." R. 418.

On May 19, 2006, an EMG study was attempted, but Claimant could not tolerate appropriate positioning and, therefore, the study was not fully completed. R. 420. Nonetheless, Dr. Sealy's impressions were "[s]evere decreased amplitude of the bilateral peroneal potentials, absent right peroneal F-wave, absent H-wave bilaterally, absent left surial potential." R. 420. Dr. Sealy concluded that Claimant suffers from bilateral S1 radiculopathy, bilateral peroneal axonal peripheral neuropathy, and sensory-motor peripheral neuropathy. R. 420. On May 26, 2006, an MRI revealed a herniated disc at L4-L5 "with markedly severe spinal canal stenosis." R. 428 (emphasis added).

On May 31, 2006, Claimant presented to Dr. Kommos for a follow-up. R. 348. Dr. Kommos notes state that the May 26, 2006 MRI "show[s] a slight increase compared to the one done in January," but "it is not a severe or a very large disc herniation causing significant compromise." R. 348 (emphasis added). Regarding Claimant's foot drop on the right side, Dr. Kommos's notes state that he has "weakness of eversion and dorsiflexion," but "still has sensation on the sole of the foot." R. 348. Dr. Kommos's notes further state:

> As it stands today, he does have profound weakness on the right foot, loss of dorsiflexion and eversion, preservation of inversion. He has weakness on plantar flexion. He has loss of ankle reflex. He has symmetrical edema. He has weakness in the left foot, dorsiflexion, etc. and eversion. He does not have an bladder or bowel symptoms. . . . Clearly the picture cannot be explaining exclusively on the disc herniation that he has at L4-L5. However, after numerous discussions with Dr. Sealy he feels this could be a large contributing factor. He feels surgery is warranted. We tried on two occasions to get a thoracic MRI. Unfortunately the patient could not lie still. Dr. Sealy believes this is a lower motor neural lesion and radiculopathy and surgery is warranted. It may or may

> not help the patient.
>
> I explained to [the Claimant] that the picture is perplexing.  He is presenting with significant weakness in his leg.  I cannot explain it exclusively on the MRI of an L4-L5.  However, he does have a large disc herniation but it is not massive by any means.   I explained to him surgery may or may not help.  I explained to him there is a risk of recurrence, risk of failure, epidural scar.
>
> Right now he is using a walker to walk.  He has weakness of the L5 dermatome including weakness of the glutei and distal weakness.  His knee extensors are strong.  His knee flexors are strong.  The hip abductor and dorsiflexor and evertor of the foot and to a lesser extent plantar flexors and loss of ankle jerks. . . . [W]e are going to proceed with surgery.

R. 347.  Thus, although Claimant's treating physicians were perplexed by the cause of all of his symptoms, they recommended surgical intervention.

On June 1, 2006, Claimant presented to Dr. Sealy and upon physical examination he was unable to lie supine. R. 415.  Dr. Sealy's notes state that Claimant's disorder "is progressive and the herniated disc clearly progressive in correlation."  R. 416. Thus, he opined that "[s]urgical intervention with decompression is necessary. . . ." R. 416.   Thereafter, Claimant underwent a lumbar laminectomy.

On June 12, 2006, after undergoing the lumbar laminectomy, Claimant presented to Dr. Kommos reporting that he was doing better with more strength in his left leg, but his right foot was still weaker than the left. R. 346.  Dr. Kommos stated that: "Overall, I am pleased with his progress.  He has less pain and less numbness.  He still has weakness in his abductor." R. 346. On June 15, 2006, Dr. Kommos's notes show that Claimant "is improving," "[t]he pain is his leg is disappearing," and "strength is gradually coming back."  R. 346.  Dr. Kommos's notes also state that Claimant is to remain off work. R. 346.

On July 6, 2006, Claimant presented to Dr. Sealy whose notes provide:

> Now post surgical intervention, he ambulates independently al be it [sic] cautiously with subtle bilateral foot drop. He admits to tightness in the lower back and occasional shooting pains from the lower back down the posterior left thigh to the knee. . . . [T]he MRI of the c-spine and T-spine performed following the surgery were reviewed and they do not demonstrate any neurological features relevant to this clinical picture. His current improvement has allowed him to stop several medications including the Cymbalta.

R. 413. Dr. Sealy stated that Claimant's demeanor was "[c]heerfuly . . . in contrast to painful distress all other times." R. 413. Dr. Sealy's impressions were paraparesis secondary to severe spinal canal stenosis improving post operative and paraparesis secondary to lumbrosacral radiculopathy. R. 413. Dr. Sealy also stated:

> The right foot drop is more than a right peroneal palsy and represents a part of the radiculopathy. In fact the entire syndrome relates to the full impact of the "entrapment" of the cauda equine and thus the radiculopathy. The recovery is expected to be protracted and the significant recovery over the past month post operative is optimistic of more to come.

R. 414. On July 19, 2006, Dr. Kommos's notes show that Claimant was "doing a remarkable recovery." R. 345. Dr. Kommos' stated: "He is walking with no limp. His glutei has recovered. His left foot is close to normal." R. 345. However, Dr. Kommos also stated that Claimant's right foot continued to show weakness of eversion and Claimant did complain of some back pain. R. 345. Similarly, on July 31, 2006, Dr. Kommos's notes reveal that Claimant was "walking much better," and strength was returning in the lower extremity. R. 345. However, Claimant still complained of "a lot of back pain and leg pain," and, therefore, Dr. Kommos ordered another MRI. R. 345. Claimant was to remain off work. R. 345.

On August 4, 2006, an MRI revealed a "marked reduction" in the size of the previous

herniation, but "mild lateral recess stenosis at this level and postoperative enhancement surrounding the L5 nerve root on the left." R. 355. Fluid collection was also observed in the sagittal plane "consistent with a postoperative seroma." R. 355. Foraminal stenosis bilaterally due to concentric bulges and facet disease were also present. R. 355.

On August 10, 2006, Claimant presented to Dr. Sealy stating:

> Today he relates that from early July he began to experience "jolting" lightening bolts from the lower back of the left thigh to the popliteal fossa. He also relays that when he coughs or sneezes, the left knee buckles. He indicates that he experiences occasional catch in the right lower back which causes limping on the right side. Despite the above, his ambulation continues to improve to the point that he is able to wear slippers. He readily expressed that previously he could not hold slippers between the first and second toes on the right foot.

R. 411. Physical examination showed that Claimant was in no painful distress. R. 411. Claimant's gait was "[f]air wearing slippers with only subtle nonspecific non-lateralized limp." R. 411. Dr. Sealy's impressions were unchanged except that he opined that Claimant's paraparesis secondary to lumbar sacral radiculopathy was "significantly improving." R. 411. Dr. Sealy opined, however, that "he is incapable of working at this time and this is expected to be protracted [regarding] his prior occupation." R. 412.

On August 24, 2006, Dr. Kommos stated that the MRI revealed some scar tissue around the nerve and "very mild neural foraminal entrapment." R. 344. Dr. Kommos recommended continued physical therapy and stated that "[w]e will discuss his work ability" during the next visit. R. 344. On September 14, 2006, Dr. Sealy's notes show that after surgery Claimant's "pain has improved significantly." R. 409. On September 15, 2006, Dr. Kommos's notes state:

> He is having some numbness in his left leg. Neurologically he has improved tremendously since his surgery. His left foot is very

> strong and the right foot still has some weakness in eversion. He
> has some sciatic pain on the left side. . . . [H]e is not ready to go
> back to work and is excused from work.  We will give him a work
> hardening program for another couple of months.

R. 344.  On November 11, 2006, Claimant complained to Dr. Kommos of experiencing more

pain in his back and down the leg.  R. 343.   Claimant's strength remained good except that due

to the eversion in the right foot, Claimant's right foot strength was graded as 3/5.  R. 343.

Claimant walked without a limp, but Dr. Kommos recommended that he was still unable to go

back to work.  R. 343.

A November 9, 2006 MRI showed a mild broad based protruding disc at the L4-L5 with

fluid surrounding the left L5 nerve root and displacing the left L5 nerve root and left anterior

thecal sac.  R. 353.  The fluid collection was slightly less than on the August 3, 2006, MRI.  R.

353.  Otherwise, the MRI showed no significant change.  R. 353.  On November 14, 2006, Dr.

Sealy stated:

> The patient presented with a recently done MRI follow up his post
> operative process. . . .   In summary again reveals almost
> unchanged element of the protruding L4-L5 predominantly with a
> lateral recessed narrowing on the left side.   However with this
> neural foramen bilaterally appears significantly unchanged except
> for the post operative changes and the fluid collection as
> previously seen may be minimally decreased.   However this does
> explain the patient's unilateral of the neuralgia as he performs any
> type of bending or lifting or stooping.   This patient works with
> heavy duty Diesel motors and it is not possible at this time to
> foresee him returning to this job.   The consideration is whether or
> not revisiting the surgical procedure will help and I suspect that it
> may not.   In terms of this patient's functional capacity and whether
> or not he will be engaged in meaningful jobs for his livelihood
> outside of his current occupation, vocational rehab may help in this
> regard.   However regardless of the type of job it must not involve
> lifting, bending or stooping to any significant degree and
> specifically not lifting objects.   This will be an absolute
> aggravating factor and he will not be able to perform this.  One can

-10-

> suspect that with time there may be further improvement but this is likely to be very slow but the optimism exists as the patient was initially unable to perform any degree of walk then the walker and now unaided and the pain in severity becoming progressively less. In the meantime he will be allowed to increase the Neurontin as tolerated above and the Capsaicin cream may help with this predominant distressing neuralgia with the clinical correlation of narrowing of the lateral recess at the L4-L5 region but note that he has bilateral signs pain in the left lumbrosacral region and paraesthesia in the right lumbrosacral region with some weakness on the right side as well as described above.  He will be followed for this disorder without a finite time for any significant improvement facilitating his return to his prior occupation.

R. 408.  Thus, on November 14, 2006, Dr. Sealy opined that Claimant would not be able to return to his past relevant work and with regard to any other meaningful employment Claimant would be unable to lift, bend, or stoop to any significant degree.  R. 408.

On November 29, 2006, Dr. Kommos stated that Claimant "can work at medium work capacity."  R. 343.   Dr. Kommos stated that while Claimant's right foot "does show evidence of weakness in dorsiflexion and eversion," Claimant "has been released to return to work without . . . restrictions."  R. 343.

On January 16, 2007, Claimant presented to Dr. Sealy complaining of a sudden jolt of pain across the back and down the back of the left leg.  R. 405.  Claimant stated that "[a]lthough such symptoms have been gradually occurring over the past month in an unprovoked manner, the symptoms became precipitously severe at that time."  R. 405.  Claimant stated that the pain is aggravated by coughing and sneezing, especially when he is standing.  R. 405.  Claimant also stated that lifting ten pounds is "unbearable." R. 405.  During physical examination, Claimant was in no acute distress.  R. 405.  Strength was relatively normal, but sensation was decreased in the L4 and L5, and coordination and gait were only fair.  R. 405.  Dr. Sealy's notes state:

> Notably the concern for the functional capacity evaluation indicating that the patient can perform at the medium or moderate level is mechanical and not clinical.  It should be noted that the patient's limitation is based on the anatomical abnormality and not on abstract ability to lift.  For example even in the absence of lifting anything coughing and sneezing invoked excruciating radicular pain in the lower extremity.  Even in the absence of lifting bending or stooping invoked excruciating radicular pain to the lower extremity.  Therefore one can understand that adding even 10 pounds to such passive maneuvers is worse and thus there is no parallel with the strictly abstract study done in terms of its clinical utility.  The patient may benefit from possible further surgical intervention with further decompression of the nerve root or more appropriate, stabilization of the spine.  In such event the clinical disorder will have to be revisited.  As it stands at this point in time, the minimal normal utilization of the back as in lateral flexion, anterior to posterior flexion and extension result in excruciating suffering even as passive motion and thus one cannot envision this patient even going to work to sit and perform paper tasks.

R. 406.  Thus, despite Dr. Kommos's finding that Claimant could perform medium work, Dr. Sealy opined that the clinical impact of Claimant's impairment rendered Claimant unable to do even sedentary work.  R. 406.   Dr. Sealy also opined that Claimant was suffering from depression secondary to chronic pain.  R. 405.

On January 18, 2007, Claimant presented to Dr. Stephen R. Goll, an orthopedic surgeon, for an independent medical evaluation of the lumbar spine.   R. 321.  Claimant stated that following his surgery, "his right foot drop improved significantly," but "he has continued numbness in the right foot region as well as pain in the left thigh."  R. 321.  Claimant further stated that he has only had minimal improvement regarding his back and left leg pain.  R. 321.  At that time, Claimant was taking Soma, Neurontin, Protonix, Cymbalta, and Celebrex.  R. 325.  Physical examination revealed pain to palpation in the lumbar spine and sacroiliac, and pain with flexion and extension, but no pain with lateral bending.  R. 326.  Straight leg testing was positive

on the left leg.  R. 327.  Strength was relatively normal and sensation was decreased only in the L5.  R. 327.  Reflexes were poor.  R. 327.  Dr. Goll's impressions were: 1) status post lumbar discetomy L4-L5; and 2) lumbar disc degeneration L4-L5 with epidural fibrosis on the L5 left nerve root.  R. 328.  Dr. Goll recommended: 1) no further intervention;  2) treatment with oral medications and "moving forward with limited physical capacities"; 3) consideration of referral to pain management which could include subsequent epidural blocks and possibly a spinal cord stimulator; and 4) possible surgical intervention.  R. 328.  Dr. Goll stated that without surgery Claimant would be at maximum medial improvement at this time.  R. 329.  According to Dr. Goll, Claimant "has had a functional capacity evaluation . . . which indicated he could work in a medium capacity, lifting 35 pounds maximum, and that would be his permanent work restrictions."  R. 329.  Dr. Goll opined that without surgery Claimant should be limited to light duty work restrictions.  R. 329.

On February 21, 2007, Dr. Kommos opined that Claimant had reached maximum medical improvement with a five (5) percent disability rating.  R. 342.  Dr. Kommos discussed the possibility of a spinal fusion, but opined that he did not think it was advisable. R. 342. Dr. Kommos stated that Claimant had been released to return to work with restrictions.  R. 342.

On May 30, 2007, Dr. Sealy's notes state:

> [T]he patient's activity of daily living is tremendously modified since the injury.  Currently sleeping is his best time.  As he awakens and commences daily activity sitting causes the right leg to go to sleep, walking causes a radicular pain in the left lower extremity.  He also experiences some discomfort in the area of the lateral cutaneous nerve of the left thigh.  Despite this pain level in general has tremendously improved as there was the early stages whereby the patient could hardly make it on a walker.

R. 403.  Dr. Sealy diagnosed Claimant with failed back syndrome, chronic lumbrosacral

radicular pain, predominantly left, and depression secondary to chronic pain. R. 403.  Claimant's strength was normal, coordination was fair, and gait was "fair and close to normal." R. 403.  Dr. Sealy concluded that Claimant's "disability is expected to be long term as any amount of bending lifting or stooping and specifically any amount of activity beyond resting in bed aggravates this patient's normal neurologic condition with sleeping of the right leg when sitting radicular pain in the left lower extremity when walking." R. 403-04.

On September 12, 2007, Claimant presented to Dr. Sealy continuing to experience radicular pain and, at times, excruciating pain in the lateral aspect of the thigh. R. 401.  Claimant also complained of depression related to the pain.  R. 401.  Dr. Sealy changed Claimant's prescription for Cymbalta to Wellbutrin 75mg.  R. 401. Neurontin was also increased to 800mg three times daily.  R. 402.   During physical examination, Claimant was in "no obvious painful distress compared to prior earlier visits." R. 401.   Dr. Sealy concluded: "This condition is an intractable and indefinite disorder and with the patient as a detailed engine mechanic it is not foreseen that he will be able to return to work in the future." R. 402.

On October 24, 2007, Claimant reported still experiencing pain, sometime severe.  R. 399.  Dr. Sealy stated: "Despite this [pain] he is still ambulatory and has not experienced any progressive weakness and if any thing an improvement in power and limited predominantly by the chronic pain disorder." R. 399.  Claimant's strength, coordination, and gait were normal.  R. 399. Claimant reported that he became "very angry" while taking Wellbutrin. R. 400. Dr. Sealy again concluded that "[t]his disorder is expected to be indefinite at this point in time and I do not foresee this patient returning to any significant physical function in his capacity to work." R. 400.

On that same day, Dr. Sealy completed a Social Security Questionnaire regarding Claimant's impairments.  Dr. Sealy stated that the Claimant does not suffer from a mental impairment that significantly interferes with his daily functioning and no referral had been made for formal psychological or psychiatric treatment, but psychological medication had been prescribed. R. 391.   Regarding Claimant's motor deficits, Dr. Sealy stated: "The motor deficits are resultant of the chronic lower back pain (failed back syndrome) and pertain to hip flexion. . . ." R. 392.   As to Claimant's gait and station, Dr. Sealy report that it is normal "provided that he does not engage in lifting, bending, or stooping where a limp may evolve." R. 392.  When asked whether Claimant requires an assistive device, Dr. Sealy stated that he is ambulatory.  R. 392.

On January 3, 2008, Dr. Sealy's notes state that Claimant's failed back syndrome renders him "neurologically disabled." R. 397.   Moreover, his notes reveal that Claimant developed flu like symptoms in December of 2007, and as a result Claimant experienced "severe radical pain on the left side into the left gluteal region down the back of the thigh to the left knee and numbness in the entire right leg." R. 397.   According to Claimant, once the flu symptoms subsided, the pain also subsided.  R. 397.  Dr. Sealy notes show: "Again the elements of cough and cold . . . maneuver violently transmitting pressures across the surgical bed and the area of prior injury characterized the nature of the disorder with its outright and profound disabling features."  R. 398.  Dr. Sealy maintained Claimant's diagnosis of failed back syndrome, chronic lumbrosacral radicular pain, predominately left, and depression secondary to chronic pain.  R. 397.

On February 5, 2008, Claimant presented to Dr. Sealy complaining of "excruciating pain in the lower back and extending in the radicular distribution down the back of the left thigh to a

greater extent than the right." R. 395.  Claimant stated that the pain was so severe that if he were not scheduled for an appointment, he would have gone to the emergency room.  R. 395. Claimant stated that he was walking up to three miles a day, but had to stop doing that due to the pain.  R. 395.  Physical examination revealed normal strength, fair coordination and normal gait. R. 395.  Regarding Claimant's gait, Dr. Sealy stated:  "Although [in] excruciating pain he is not walking with any significant limp and although he experiences weakness of the dorsiflexor of the right foot . . . [h]is gait is normal."  Dr. Sealy replaced Neurontin with Lyrica, added Xanax and Trazadone, and ordered an MRI.  R. 396, 394.  On February 14, 2008, an MRI revealed "diffuses disc protrusion at the L4-L5 and L5-S1 . . . no recurrent or focal disc herniation detected . . . no canal stenosis, contrast enhancing lesion or marrow replacing lesion."  R. 431.

On March 4, 2008, Claimant reported to Dr. Sealy that the pain "prevents him from resting at night," and he described a burning sensation on the lateral aspect of the left thigh.  R. 394.  Claimant was unable to tolerate Trazadone and was placed on Ultram.  R. 394.

On May 6, 2008, Claimant reported aggravating his back after suffering from a bout of food poisoning.  R. 463.  In the hospital, Claimant was given Oxycodone, Regian, and Pepcid. R. 463.  Dr. Sealy again concluded that "[t]his patient has failed back syndrome and there is no view of returning to work in [ ] sight unless things drastically change in the future but neurologically indefinite inability to return to work."  R. 464.  On July 2, 2008, during a follow-up appointment, Dr. Sealy again stated that Claimant has "a life altering underlying neurological disorder termed failed back syndrome disqualifying him to all gainful employment. . . ."  R. 467.[3]

---

[3] The record contains additional medical records created subsequent to July 2, 2008, but those records were submitted to the Appeals Council and were not available to the ALJ at the time of his decision.  R. 468-498.  Those

## III.   **PROCEEDINGS BELOW.**

Claimant's application was denied initially and upon reconsideration.  R. 79-82.  In the reconsideration level denial, the Commissioner relied, in part, on an October 16, 2007 RFC completed by Dr. Debra Troiano based on a records review.  R. 81, 383-90.  Dr. Troiano appears to have based her opinions on a review of the MRI's and the reports of Drs. Kommos and Sealy through September of 2007.  R. 384-85.  Dr. Troiano opined that Claimant can occasionally lift twenty pounds, frequently lift ten pounds, and sit and or walk for about six hours in an eight hour workday.  R. 384.  Dr. Troiano also opined that Claimant was unlimited in his ability to push or pull including the operation of hand and/or foot controls.  R. 384.  Dr. Troiano concluded that Claimant could frequently balance, kneel and crouch, but could only occasionally climb ramps or stairs, stoop and crawl. R. 385.  Dr. Troiano stated that climbing scaffolds should be avoided, and climbing stairs, crouching and stooping should be limited to one-third of a given work day.  R. 385.  Dr. Troiano opined that Claimant has no limitations in the ability to manipulate, visualize, or communicate, and Claimant has no environmental limitations.  R. 387.  Dr. Troiano concluded that the Claimant "has definite [medically determinative impairment] and moderate functional limitations.  His allegations are consistent with [the medical evidence of record].  He appears capable on a physical basis of performing [substantial gainful activity] with limitations described in this report."   R. 388.   Thus, Claimant's application was denied on the reconsideration level.  R. 82-83.

Thereafter, Claimant requested a hearing before an ALJ.  R. 89-90.  On September 10, 2008 a hearing was held before ALJ Douglas W. Abruzzo.  R. 25-78.  Claimant, who was

---

records are not relevant to the issues raised in this appeal because Claimant does not allege that the final decision of the Commissioner is not supported by substantial evidence based on the additional evidence submitted to the Appeals Council.

represented by counsel, and Vocational Expert (the "VE"), Dr. Randolph Salmons were the only persons to testify at the hearing.  R. 25-78.   On February 11, 2009, the ALJ issued a decision finding Claimant not disabled.  R. 13-24.

In his decision, the ALJ made the following findings:

1. The Claimant meets the insured status requirements of the Social Security Act through September 30, 2011;

2. The Claimant has not engaged in substantial gainful activity since January 6, 2006, the alleged onset date;

3. The Claimant has the following severe impairments: low back pain syndrome secondary to work-related injury sustained in 2005, disc herniation at the C4-C5 level and obesity;[4]

4. The Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

5. After careful consideration of the entire record, the undersigned finds that the Claimant has the residual functional capacity to perform light work as defined in the Social Security Regulations; limited to occasional balancing, crawling and climbing ladders; must avoid climbing ropes and scaffolds; limited to more than occasional pushing and pulling with the left lower extremity and operation of pedals unless the pedal requires less than 5 pounds to operate; must avoid prolonged (6 hours of an eight-hour shift) exposure to cold temperature extremes (less than 30 degrees Fahrenheit) along with extreme wetness or humidity; must avoid exposure to unprotected heights; for sedentary occupations only, must be afforded a sit/stand/walk option permitting no more than five steps from the work station, a stretching maneuver, returning to the work station within one minute, performed not more than five times each hour;

6. The Claimant is unable to perform any past relevant work;

7. The Claimant was born on June 1, 1961, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date;

8. The Claimant has at least a high school education and is able to communicate in English;

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the Claimant is "not

---

[4] The ALJ's statement that Claimant has disc herniation at the "C4-C5 level" appears to be a typographical error.  R. 15.

disabled," whether or not the Claimant has transferable job skills;

10. Considering the Claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Claimant can perform; and

11. The Claimant has not been under a disability, as defined in the Social Security Act, from January 6, 2006 through the date of this decision.

R. 13-24 (emphasis in original).  Thus, the ALJ determined that the Claimant is not disabled.  R. 13-24.

At step-two in the sequential evaluation process described below, the ALJ found that Claimant has the following severe impairments: low back pain syndrome secondary to a work-related injury, disc herniation, and obesity.  R. 15.  The ALJ stated:

> The symptoms reasonably related to the impairments listed above have more than a minimal effect on the [C]laimant's ability to perform work functions on a sustained basis and are therefore found to be "severe."  On the other hand, symptoms reasonably related to the impairments listed below do not, singly or in combination, have more than a minimal effect on the [C]laimant's ability to perform work functions on a sustained basis and they are found to be "non-severe" as described below.  The medical evidence shows that the [C]laimant's treating physician prescribed Wellbutrin and Cymbalta for symptoms of depression secondary to his chronic pain disorder.  However, the undersigned finds that the [C]laimant's mental impairments, when considered alone, do not cause more than minimal limitations in his ability to perform basic mental work activities, and, therefore, are not severe.

R. 15-16. (emphasis added).  Thus, the ALJ found that Claimant's low back pain secondary to a work-related injury, disc herniation, and obesity caused more than a minimal effect on Claimant's ability to work and, therefore, were severe impairments.  R. 15. The ALJ then separated those impairments which he found not severe.  R. 16. The ALJ stated that those impairments "listed below do not, singly or in combination, have more than a minimal effect on

the [C]laimant's ability to perform work functions on a sustained basis and they are found to be 'non-severe.'" R. 16.  The only impairment "listed below" at step-two, which the ALJ found not severe, was Claimant's mental impairment.  R. 16.  Regarding Claimant's mental impairment, the ALJ stated that "when considered alone" it "does not cause more than a minimal limitation in his ability to perform basic mental work activities, and therefore [is] not severe."  R. 16 (emphasis added).  Thus, the ALJ considered Claimant's mental impairment "alone" and only as it related to his ability to perform basic "mental" work activities.  R. 16 (emphasis added).

When the ALJ considered whether the Claimant has an impairment or combination of impairments which meets or medically equals a listing, the ALJ repeated: "However, the undersigned finds that the [C]laimant's mental limitations, when considered alone, does not cause more than minimal limitation in his abilities to perform basic mental work activities, and, therefore, are not severe."  R. 17 (emphasis added).  Thus, the ALJ again stated that he considered the Claimant's mental impairments "alone."  When determining the Claimant's RFC, the ALJ states that he has considered all of Claimant's symptoms to the extent they are consistent with objective medical evidence, and notes he must consider both physical and mental impairments. R. 17. However, the entire RFC analysis focuses on Claimant's physical impairments and the ALJ does not specifically address Claimant's mental impairment in his RFC analysis. *See* R. 17-22.

Regarding the treatment records and opinions of Dr. Sealy, the ALJ stated:

> The undersigned has also carefully reviewed the opinion of Dr. Sealy, the [C]laimant's neurologist.  It appears Dr. Sealy's [sic] has relied predominantly on [C]laimant's subjective descriptions of pain-related impairment and there is no evidence Dr. Sealy has any training and/or experience in vocational assessment on which to base an opinion of [C]laimant's vocational profile.  While Dr.

> Sealy's medical opinion is given appropriate weight according to
> its consistency with the medical evidence as a whole, that portion
> of Dr. Sealy's opinion on [C]laimant's vocational functioning is
> disregarded, as the Commissioner has reserved such vocational
> issues to the ultimate fact finder.

R. 22.  Thus, the ALJ disregarded Dr. Sealy's multiple opinions that Claimant was disabled from

a neurological standpoint from all substantial gainful activity.  R. 22.

As for the other opinion evidence of record, the ALJ gave "substantial weight" to the

opinion of Dr. Troiano, a non-examining state agency consultant, "because the opinion is

consistent with the objective medical findings including the diagnostic studies and laboratory

findings."  R. 21-22.  The ALJ also gave "somewhat decreased . . . weight" to the opinion that

"workers' compensation doctors released the [C]laimant to medium work, notwithstanding

follow up notes show evidence of some sensory deficits as well as continued radiculopathy."  R.

22.  This "opinion" of the "workers' compensation doctors" appears to stem from the records of

Dr. Kommos discussing the same.  *See* R. 406.

Immediately following the ALJ's discussion of the opinion evidence of the record, the

ALJ states:

> During the hearing, the undersigned asked the [C]laimant how far
> he could bend over.  The [C]laimant responded he did not know, as
> no doctor had ever asked him to do that.  That is highly
> inconsistent with the multiple physical examinations in which a
> physician reported the degree of lumbar spine flexion and
> extension.  This Administrative Law Judge then asked the
> [C]laimant could he (who was standing) place his palms on the
> table.  The [C]laimant then made what appeared to be a strong
> effort to bend his back sufficiently to place his palms on the table.
> Although grimacing and grunting as if in pain, the [C]laimant was
> successful in bending his lower back only approximately 10 to 15
> degrees down toward the table top, and this Administrative Law
> Judge cautioned the [C]laimant not to hurt himself.  Seconds later,
> the [C]laimant quickly sat down at that table in a straight-back

chair, creating a 90-degree angle between his lumbar spine and his
thighs.

R. 22.  In his decision, the ALJ does not elaborate on the significance of the above stated event at

the hearing and what, if any, conclusion he drew from it.  R. 22.

After the ALJ's decision, Claimant requested review before the Appeals Council and

submitted additional evidence.  R. 7-8, 468-98.  On June 19, 2009, the Appeals Council denied

Claimant's request for review making the ALJ's decision the final decision of the Commissioner.

R. 1-4.  Thereafter, Claimant sought review of the Commissioner's final decision in the District

Court.  Doc. No. 1.

## IV.   THE PARTIES' POSITIONS.

The Claimant raises nine issues regarding the Commissioner's final decision as set forth

below:

1.  At step-two of the sequential evaluation process, the ALJ erred by failing to consider
    the combined effects of all of Claimant's impairments.  Doc. No. 15 at 15-18.  More
    specifically, Claimant alleges that by considering Claimant's mental impairments
    "alone," the ALJ erred at step-two (citing *Wuerth v. Astrue*, Case No. 8:06-cv-1353-
    T-30TBM, 2008 WL 680211 (M.D. Fla. Mar. 7, 2008));[5]

2.  The ALJ failed to apply the proper legal standard and/or failed to show good cause
    for disregarding the opinions of Dr. Sealy.  Doc. No. 15 at 20-23.  Claimant maintains
    that rather than relying solely on the subjective statements of Claimant, Dr. Sealy
    relied on his own physical examinations, observations, multiple MRIs, and an EMG
    study.  *Id.*   Claimant argues that the ALJ impermissibly rejected the opinions of Dr.
    Sealy because the ALJ reached a different opinion after reviewing the medical record
    and failed to give the Court a sufficient basis for determining that the proper legal
    standards have been followed  (*Id.*) (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41
    (11th Cir. 1992); *Hillsman v. Bowen*, 804 F.2d 1179, 1182 (11th Cir. 1986); *Martin v.
    Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990));

3.  The ALJ's finding that Claimant does not meet listing level severity for Listing 1.04
    is not supported by substantial evidence (Doc. No. 15 at 15);

---

[5] Claimant also maintains that the ALJ failed to consider the effects of Claimant's shoulder and knee pain on his
other impairments at step-two.  Doc. No. 15 at 15-18.

4. The ALJ erred by failing to incorporate a PRT into his analysis (Doc. No. 15 at 18-19);

5. The ALJ erred by failing to order a consultative psychological or psychiatric examination to determine the severity of Claimant's depression (Doc. No. 15 at 19-20);

6. The ALJ failed to properly apply the pain standard and failed to properly apply SSR 96-7p in assessing the Claimant's credibility (Doc. No. 15 at 23-25);

7. The ALJ erred by failing to re-contact Dr. Goll due to the conflict in his opinion regarding whether Claimant could perform medium or light work (Doc. No. 15 at 25-26);

8. The ALJ erred by failing to elicit testimony and make specific findings regarding the side-effects of Claimant's medications (Doc. No. 15 at 26-27); and

9. The final decision of the Commissioner is not supported by substantial evidence because the ALJ acted as both judge and physician (Doc. No. 15 at 27-28).

Accordingly, Claimant requests that the Court enter an order reversing the final decision of the Commissioner and remanding for an award of benefits. Doc. No. 15 at 28. Alternatively, Claimant requests that the case be remanded pursuant to sentence four of Section 405(g) for a supplemental hearing. *Id.*

The Commissioner generally maintains that substantial evidence support the final decision of the Commissioner. Doc. No. 16 at 1-27. As to each issue raised above, the Commissioner states:

1. The ALJ "thoroughly discussed the evidence and properly considered the combined effect of [Claimant's] impairments in assessing his RFC." Doc. No. 16 at 11. Moreover, the Claimant failed to provide evidence that his depression interfered with his ability to perform basic work activities ( Doc. No. 16 at 12-14); The Commissioner does not directly address Claimant's argument that the ALJ erred by considering Claimant's alleged mental impairment "alone." *See* Doc. No 16 at 8-14. However, the Commissioner implicitly addresses the Claimant's argument by stating that the ALJ "'could not have committed any error at step two because he found that [the claimant] had a severe impairment or combination of impairments and moved on

to the next step in the evaluation, which all that is required at step-two.'"  Doc. No. 16 at 8 (quoting *Council v. Barnhart*, No. 04-13128 at *4 (11th Cir. 2004) (unpublished)).[6]

2. The ALJ had good cause to reject the opinions of Dr. Sealy because:  his opinion that Claimant was disabled is an issue reserved for the Commissioner and not entitled to any weight; his medical records after Claimant's surgery do not include objective medical findings establishing that Claimant was unable to work; he only provided conservative treatment; he relied on Claimant's subjective allegations in reaching his opinions regarding Claimant's ability to work; his opinions are not supported by his own medical records; his opinions are not supported by the other medical records; and his opinions are contradicted by Dr. Kommos's opinions (Doc. No. 16 at 17-20);

3. Substantial evidence supports the ALJ's finding that Claimant does not meet or medically equal Listing 1.04 (Doc. No. 16 at 4-8);

4. The ALJ properly included the PRT into his analysis (Doc. No. 16 at 14-15);

5. The ALJ was not required to order a consultative psychological or psychiatric examination because the record contained sufficient evidence upon which is make an informed decision (Doc. No. 16 at 15-16);

6. Substantial evidence supports the ALJ's finding that Claimant's subjective allegations were not entirely credible (Doc. No. 16 at 20-22);

7. There is no regulation requiring the ALJ to re-contact a one-time examiner and, therefore, the ALJ did not err by failing to re-contact Dr. Goll (Doc. No. 16 at 22-23);

8. The ALJ did not err by failing to elicit testimony regarding the side-effects of Claimant's medications because the Claimant did not allege that he had side-effects from his medications which would affect his ability to work and the medical records do not indicate that Claimant ever complained of side-effects which would affect his ability to work (Doc. No. 16 at 23-27); and

9. The Commissioner maintains that substantial evidence supports the ALJ's decision and, therefore, the Commissioner implicitly denies that the ALJ acted as both judge and physician.

The Commissioner requests that the final decision be affirmed.  Doc. No. 16 at 25.

---

[6] Unpublished decisions of the Eleventh Circuit are not binding, but are persuasive authority.

## V.   LEGAL STANDARDS.

### A.   THE ALJ'S FIVE-STEP DISABILITY ANALYSIS.

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 CFR §§ 404.1520(a), 416.920(a).   The steps are followed in order.   If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b).   Substantial gainful activity ("SGA") is defined as work activity that is both substantial and gainful.   "Substantial work activity" is work activity that involves performing significant physical or mental activities. 20 CFR §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually performed for pay or profit, whether or not a profit is realized. 20 CFR §§ 404.1572(b), 416.972(b).   Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA. 20 CFR §§ 404.1574, 404.1575, 416.974, 416.975.   If an individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR §§ 404.1520(c), 416.920(c).   An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.   20 CFR § 404.1521.   An impairment or combination of impairments is "not severe"

when medical or other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 CFR §§ 404.1521, 416.921.

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A mere diagnosis is insufficient to establish that an impairment is severe.  *See Sellers v. Barnhart*, 246 F.Supp.2d 1201, 1211 (M.D. Ala. 2002) (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)). A claimant has the burden of proof to provide substantial evidence establishing that a physical or mental impairment has more than a minimal effect on a claimant's ability to perform basic work activities. *See Bridges v. Bowen*, 815 F.2d 622, 625-26 (11th Cir. 1987).  However, a remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Comm'r*, 265 F.3d 1214, 1219 (11th Cir. 2001).  If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis

-26-

proceeds to the third step.

At step three, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listing(s)"). 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's impairment or combination of impairments meets or medically equals the criteria of a Listing and meets the duration requirement (20 CFR §§ 404.1509, 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the claimant's RFC. 20 CFR §§ 404.1520(e), 416.920(e). An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations secondary to his established impairments. In making this finding, the ALJ must consider all of the claimant's impairments, including those that may not be severe. 20 CFR §§ 404.1520(e), 404.1545, 416.920(e), 416.945.

Next, the ALJ must determine step four, whether the claimant has the RFC to perform the requirements of his past relevant work. 20 CFR §§ 404.1520(f), 416.920(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.R. § 404.1545(b). The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The

term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA. 20 CFR §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  If the claimant has the RFC to do his past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work, the analysis proceeds to the fifth and final step.

At the last step of the sequential evaluation process (20 CFR §§ 404.1520(g), 416.920(g)), the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education and work experience.   In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 CFR § 404.1567.  If the claimant is able to do other work, he is not disabled.  If the claimant is not able to do other work and his impairment meets the duration requirement, he is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.   In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the RFC, age, education and work experience. 20 CFR §§ 404.1512(g), 404.1560(c), 416.912(g), 416.960(c).

**B.    THE STANDARD OF REVIEW.**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  To remand under sentence four, the district court must either find that the Commissioner's decision applied the incorrect law, fails to provide the court with sufficient reasoning to determine whether the proper law was applied, or is not supported by substantial evidence.  *Keeton v. Dep't of Health & Human Serv.*,

21 F.3d 1064, 1066 (11th Cir. 1994) (reversal and remand appropriate where ALJ failed to apply correct law or the ALJ failed to provide sufficient reasoning to determine where proper legal analysis was conducted) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)); *Jackson v. Chater*, 99 F.3d 1086, 1090-91 (11th Cir. 1996) (remand appropriate where ALJ failed to develop a full and fair record of claimant's RFC); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636-37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985). The district court may remand a case to the Commissioner for a rehearing under sentences four or six of 42 U.S.C. § 405(g); or under both sentences. *Jackson*, 99 F.3d at 1089-92, 1095, 1098. Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*,

732 F.2d 827, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his

basis for determining that claimant's depression did not significantly affect her ability to work).[7]

## VI.   ANALYSIS.

### 1.   Step-two.

As set forth above, the Claimant maintains that the ALJ erred at step-two by failing to

consider the combination of all of Claimant's impairments.   Doc. No. 15 at 15-18.   More

specifically, Claimant alleges that the ALJ erred by considering Claimant's alleged mental

impairment in isolation.  *Id.*  The Commissioner does not directly respond to this argument to the

extent Claimant alleges that the ALJ erred by considering the mental impairment only in

isolation.  *See* Doc. 16 at 8-14.   However, as set forth above, the Commissioner does argue that

the ALJ could not have erred at step-two because he found a severe impairment.   Doc. No. 16 at

8 (quoting *Council v. Barnhart*, No. 04-13128 at *4 (11th Cir. 2004) (unpublished)).[8]

In *Council*, No. 04-13128 at *4 (11th Cir. 2004), the claimant's argument on appeal was

that the ALJ erred because by not finding a severe mental impairment at step two, the ALJ

ignored the claimant's mental impairments when determining the claimant's RFC.  *Id.*   The

Eleventh Circuit stated the following:

> At step two of the sequential evaluation, the ALJ reviewed the
> medical evidence regarding both her physical and mental
> impairments and concluded that Council "had an impairment or
> combination of impairments considered "severe."   Therefore, the
> ALJ could not have committed any error at step two because he
> found that Council had a severe impairment or combination of

---

[7] On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (on remand ALJ required to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (on remand ALJ required to consider the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

[8] *See* n.6.

> impairments and moved on to the next step in the evaluation,
> which is all that is required at step two.

*Id*.  (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).  The Eleventh Circuit further

stated, however, that the "ALJ's analysis at step four [the RFC determination] also shows that

the ALJ did not ignore Council's mental impairment. . . ."  *Id*. at *6.  The Eleventh Circuit

explained that at step-four the ALJ thoroughly discussed the Claimant's mental impairments.  *Id*.

at *4-6.

In this case, at step-two, the ALJ separated those impairments which he found severe and

Claimant's mental impairment which he found not severe.  R. 15-16; *see* supra pp. 19-20.  When

considering the Claimant's mental impairment at step-two and at step-three when determining

whether Claimant had an impairment or combination of impairments which met a listing,  the

ALJ specifically stated that he considered Claimant's mental impairment "alone" and only as it

related to Claimant's ability to perform basic "mental" work activities.  R. 16-17.  At step-four

the ALJ correctly states he is required to first decide whether there is an underlying determinable

physical or mental impairment and then states he has considered "all symptoms" to the extent

consistent with the medical evidence.  R. 18.  However, in determining the Claimant's RFC, the

ALJ address Claimant's physical impairments in detail, yet never specifically addresses

Claimant's mental impairments.  R. 18-22.  This case is distinguishable from *Council* because, in

that case, the ALJ expressly evaluated the claimant's mental impairments in determining her

RFC.  *Council*, No. 04-13128 at *4-6 (11th Cir. 2004).  In this case, the ALJ failed to make any

specific findings regarding what effect, if any, the Claimant's alleged mental impairment may

have on Claimant's RFC.  Therefore, the Court cannot determine whether or not the ALJ's RFC

finding is supported by substantial evidence.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th

Cir. 2005) (a reviewing court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner.").

### 2. Dr. Sealy.

Claimant argues that the ALJ erred by failing to demonstrate good cause for disregarding the opinions of Dr. Sealy.  Doc. No. 15 at 20-23.  The Commissioner maintains that the ALJ had good cause to disregard Dr. Sealy's opinions because: whether or not Claimant is disabled is reserved for the Commissioner; Dr. Sealy's medical records do not support a finding that Claimant is unable to work; Dr. Sealy only provided conservative treatment; he relied on Claimant's subjective statements when reaching his opinions regarding Claimant's ability to work; his opinions are not supported by other medical evidence of record; and his opinions are contradicted by the opinions of Dr. Kommos.  Doc. No. 16 at 17-20.

As set forth above, the ALJ stated the following regarding the opinions of Dr. Sealy:

> The undersigned has also carefully reviewed the opinion of Dr. Sealy, the [C]laimant's neurologist.  It appears Dr. Sealy's [sic] has relied predominantly on [C]laimant's subjective descriptions of pain-related impairment and there is no evidence Dr. Sealy has any training and/or experience in vocational assessment on which to base an opinion of [C]laimant's vocational profile.   While Dr. Sealy's medical opinion is given appropriate weight according to its consistency with the medical evidence as a whole, that portion of Dr. Sealy's opinion on [C]laimant's vocational functioning is disregarded, as the Commissioner has reserved such vocational issues to the ultimate fact finder.

R. 22.  Thus, the ALJ disregarded that portion of Dr. Sealy's opinions about Claimant's ability to work because he relied predominantly on Claimant's subjective statements and because there is no evidence that Dr. Sealy has any particularized vocational training upon which to base an opinion on Claimant's ability to work.  R. 22.

As to the balance of Dr. Sealy's opinions, the ALJ stated that it was "given appropriate weight according to its consistency with the medical evidence as a whole. . . ." R. 22.  Thus, the ALJ did not expressly base his decision to disregard Dr. Sealy's opinions on a finding that: his own or other medical records do not support his opinions; he only provided conservative treatment; or because his opinions are contradicted by the opinion of Dr. Kommos. *See* R. 22.[9]

The Eleventh Circuit has recently held that "a court may not accept appellate counsel's *post hoc* rationalizations for agency actions," and "[i]f an action is to be upheld, it must be upheld on the same bases articulated in the agency's order." *Baker v. Commissioner of Social Security*, 2010 WL 2511385 at *3 (11th Cir. June 23, 2010) (citing *FPC v. Texaco Inc.*, 417 U.S. 380, 397 (1974) (emphasis in original)).[10]   Accordingly, because the ALJ did not base his determination regarding Dr. Sealy's opinions on most of the bases asserted by the Commissioner on appeal, the Court may not consider those bases not asserted by the ALJ in his decision.

Absent good cause, the opinions of treating physicians must be accorded substantial or considerable weight. *Lamb v. Bowen,* 847 F.2d 698, 703 (11th Cir. 1988).

> Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir.2004) (citations omitted); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir.1991); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986).

*Johnson v. Barnhart*, 138 Fed.Appx. 266, 269 (11th Cir. 2005).   "The opinion of a non-

---

[9] To the extent the ALJ's comment about affording Dr. Sealy's opinions "appropriate weight according to its consistency with the medical evidence as a whole" could be interpreted as a general suggestion the ALJ found Dr. Sealy's opinion inconsistent with some unspecified portion of Dr. Sealy's own medical records, the medical records of others, or some combination thereof, the Court address that infra.

[10] Unpublished decisions of the Eleventh Circuit are not binding, but are persuasive authority.

examining physician does not establish the good cause necessary to reject the opinion of a treating physician." *Johnson,* 138 Fed.Appx. at 269.

Social Security Regulation 96-5p ("SSR 96-5p) provides:

> [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored.  The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

*Id*.  SSR 96-5p further states that medical source opinions stating that a claimant is disabled "must not be disregarded."  *Id*.   In his decision, the ALJ states that "[w]hile Dr. Sealy's medical opinion is given appropriate weight according to its consistency with the medical evidence as a whole, that portion of Dr. Sealy's opinion on [C]laimant's vocational functioning is <u>disregarded</u>, as the Commissioner has reserved such vocational issues to the ultimate fact finder."   R. 22 (emphasis added).  On its face, the ALJ's decision to "disregard" Dr. Sealy's opinions is contrary to SSR 96-5p.

As set forth above, Dr. Sealy has a long and ongoing treatment relationship with the Claimant.  See R. 391-428, 463-67.  Dr. Sealy, a neurologist, has conducted numerous physical examinations, ordered and reviewed multiple MRI's, conducted EMG studies, administered epidural steroids, and prescribed numerous medications in order to treat the Claimant.  R. 391-428, 463-67.   During that time, Dr. Sealy repeatedly opined in his treatment notes that Claimant was unable to work or was neurologically disabled as a result of his failed back syndrome.  R. 397-98, 400, 402-04, 406, 408, 414, 464, 467. Dr. Sealy also specifically opined that Claimant

must not engage in any significant bending, stooping, or lifting due to his neurologic disorder. R. 414.   Based on the forgoing, the Court finds that the ALJ's decision to simply disregard the opinions of Dr. Sealy was not supported by good cause and failed to comply with SSR 96-5p.[11]

As to the balance of Dr. Sealy's opinions which the ALJ stated "were given appropriate weight according to its consistency with the medical evidence as a whole," that finding does not provide the Court with any meaningful information to review.   The ALJ's failure to specify how the balance of Dr. Sealy's opinions were or were not consistent with the medical record also requires remand. *See Poplardo v. Astrue*, 2008 WL 68593, *11 (M.D. Fla. Jan. 4, 2008) (failure to specifically articulate evidence contrary to treating doctor's opinion requires remand); *see also Paltan v. Comm'r of Social Sec.*, 2008 WL 1848342, *5 (M.D. Fla. April 22, 2008) ("The ALJ's failure to explain how [the treating doctor's] opinion was 'inconsistent with the medical evidence' renders review impossible and remand is required.").

## VII.   CONCLUSION.

As set forth above, because the ALJ erred by considering Claimant's alleged mental impairment in isolation, by failing to comply with SSR 96-5p or provide good cause to disregard the opinions of Dr. Sealy, and by failing to specifically articulate how his opinions were or were not consistent with the medical record the final decision of the Commissioner must be reversed pursuant to sentence four of Section 405(g).[12]   Accordingly, it is hereby **ORDERED** that:

---

[11] Although not specifically raised by Claimant, the Court notes that the ALJ disregarded the opinions of Dr. Sealy, a neurologist and long standing treating physician, regarding the Claimant's functional abilities, but gave substantial weight to the residual functional capacity evaluation of a non-examining state agency consultant. R. 21-22.  It is well settled in the Eleventh Circuit that the opinions of a non-examining physician do not constitute substantial evidence to support a decision or provide the good cause for rejecting the opinions of a treating physician. *Johnson*, 138 Fed.Appx. 266, 269 (11th Cir. 2005); *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

[12] Because the Court finds that the ALJ erred as to the first two issues raised by the Claimant, it is unnecessary to address the remaining issues.  Moreover, based on the current record, the Court cannot find that the Claimant is disabled beyond a doubt or has suffered an injustice.  Accordingly, a remand for further proceedings is appropriate.

1.  The final decision of the Commissioner is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for a new hearing and decision which complies with the provisions of this order; and[13]

2.  The Clerk is directed to enter judgment in favor of the Claimant and close the case.

**DONE** and **ORDERED** in Orlando, Florida on August 30, 2010.

_____

GREGORY J. KELLY

UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Report and Recommendation to:

Marianne S. Hoke, Esq.
1310 West Eau Gallie Boulevard, Suite D.
Melbourne, FL 32935

Susan R. Waldron
U.S. Attorney's Office
Suite 3200
400 N. Tampa St.
Tampa, Florida          33602

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Susan Kelm Story, Branch Chief
Christopher G. Harris, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia          30303-8920

---

[13] The Claimant alleged that the ALJ acted as both judge and physician.  Doc. No. 15 at 28.  Although the Court makes no finding as to that issue in this case, based on the exchange between Claimant and the ALJ at the hearing, which was specifically incorporated into the ALJ's decision (R. 22), the Court cautions the Commissioner that it is inappropriate for an ALJ to engage in "sit and squirm" jurisprudence.  *See Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982); *Johns v. Bowen*, 821 F.2d 551, 557 (11th Cir. 1987).

The Honorable Douglas W. Abruzzo
Administrative Law Judge
c/o Office of Disability Adjudication and Review
Suite 300
3505 Lake Lynda Dr.
Orlando, Florida        32817-9801